UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

——

|  |  |  |
|---|---|---|
| LUIS RUIZ, #186562, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:06-cv-17 |
| | ) | |
| v. | ) | Honorable Paul L. Maloney |
| | ) | |
| THOMAS BIRKETT, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| _____ | ) | |

This is a habeas corpus action brought *pro se* by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner is serving a sentence of 2-to-4 years' imprisonment, imposed by the Marquette County Circuit Court on September 6, 2002, after petitioner entered a plea of guilty to assault on a prison officer. MICH. COMP. LAWS § 750.197c.  The charge arose from petitioner's assault on a prison guard on July 12, 2000, at the Marquette Branch Prison, where petitioner was serving a sentence of 8-to-20 years' incarceration on his Ingham County Circuit Court conviction of assault with intent to do great bodily harm less than murder, enhanced as a habitual offender fourth felony offense.  Petitioner now seeks federal habeas corpus relief from his plea-based conviction for assault on a prison officer, on the following grounds:

(1)     Petitioner's guilty plea was not knowingly and voluntarily made;

(2)     The prosecutor committed a *Brady* violation when he failed to provide petitioner with a videotape from prison security cameras;

(3)     Ineffective assistance of counsel in providing "erroneous advice" in recommending that petitioner plead guilty because counsel never (a) filed a motion for production of the videotape; (b) failed to interview unspecified witnesses; (c) failed to "question the bias[ed]

acts of guards"; (d) failed to file a motion for an expert on the transmission of hepatitis C; and (e) "coerced petitioner to sign a conditional plea agreement that placed petitioner in a 'Hobson's choice' of signing the contemporaneous plea or face the charges originally filed";

(4) The Prosecutor violated Michigan Court Rule 6.004(D) in not bringing petitioner's case to trial within 180 days after petitioner had been charged.

(Amended Petition, ¶ 14, docket # 6).

This matter has been referred to me for review of the record and submission of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 10 of the Rules Governing Habeas Corpus Proceedings in the District Courts. Upon review of the record and the submissions of the parties, I conclude that all grounds raised in the habeas corpus petition are meritless. I therefore recommend that the petition be denied.

**Proposed Findings of Fact**

A.    **State District and Circuit Court Proceedings**

1.    District Court

On July 26, 2000, the prosecutor filed a three-count felony information charging that on or about July 12, 2000 in Marquette County, Michigan, petitioner committed assaults with intent to do great bodily harm less than murder on Resident Unit Officers Douglas Kienert, Matthew Mitchell, and Todd Ninnis in violation of Mich. Comp. Laws § 750.84. (7/26/00 Felony Information, found in Michigan Court of Appeals Record, docket # 31). Because of petitioner's status as an habitual offender, he faced a possible life sentence. On April 13, 2001, Timothy A. Koltuniak, Ph.D., a licensed psychologist and consulting forensic psychologist completed a written report to Judge James M. Collins of the 96th Judicial District Court for Marquette County, recommending that petitioner be adjudicated competent to stand trial.

(4/13/01 Report, found in Michigan Court of Appeals Record, docket # 31).  On May 14, 2001, Judge Collins conducted a preliminary examination and competency hearing.  (Competency Hearing & Preliminary Examination Transcript, docket # 21).  Petitioner was represented by Attorney Theodore F. Fulsher.  During the competency hearing, the court received expert testimony from Dr. Koltuniak.  Dr. Koltuniak testified that petitioner had related that he had hepatitis A and C, and that petitioner blamed prison officials for this medical condition.  (HT, 18).  Petitioner refused to respond to any of Dr. Koltuniak's questions regarding petitioner's July 12, 2000 confrontation with prison guards.  Petitioner's response to these questions was to stare at Dr. Koltuniak.  Dr. Koltuniak testified that petitioner's response was "not uncommon." (HT, 17-18).  Petitioner had attempted to control the interview, and he had a "very vested interest" in appearing mentally disturbed:

> Q     And how did you determine he has that interest?
>
> A     Ah, largely by speaking with Psychologist Conklin; also based on the fact that when I would allow him to vent his own complaints during the interview I had with him, there wasn't really any psychotic or disorganized thoughts going on with him.  He was perfectly capable of speaking in complete sentences, using logical verbalizations, being very coherent.  When he was in charge of what was going on, I didn't see any mental disturbance.

(HT, 25-26).  Dr. Koltuniak testified that in his expert opinion, petitioner was competent to stand trial. (HT, 22-23).  Judge James M. Collins agreed and held that petitioner was competent to stand trial.  (HT, 38).

During the preliminary examination phase of the May 14, 2001 hearing, Judge Collins received testimony from Officers Todd Ninnis, Douglas Kienert, and Matthew Mitchell.  (HT, 39-85). Thus, petitioner and defense counsel had significant insight regarding the strength of the testimonial evidence that the prosecution would be able to present if petitioner's case went to trial.  On July 12, 2000,

petitioner was housed in the "base gallery" of "Echo Block" of the Marquette Branch Prison.  Cells in this administrative segregation section of the prison have glass doors designed to help protect guards from incorrigible prisoners prone to throwing feces or urine or spitting at prison guards.  (HT, 44-45).  Within the weeks leading up to the July 12, 2000 incident, petitioner had spat at prison guards and threatened to infect them with his hepatitis C.  (HT, 66-67).  Petitioner had thrown a bag containing a yellow liquid believed to have been urine at guards.  (HT, 44-45, 83-85).

On July 12, 2000, at approximately 4:00 p.m., Officer Ninnis was in the process of escorting petitioner from the shower module back to his cell.  During this out-of-cell movement, petitioner was handcuffed in front and was wearing belly chains attached to a lead strap that Officer Ninnis held from behind.  (HT, 41, 55).  Petitioner was not wearing ankle chains.  (HT, 55).  Prisoners are well aware that while they are being escorted, they are prohibited from turning and facing the escorting officer.  (HT, 50).  Officer Ninnis and petitioner were outside the door of petitioner's cell when petitioner started  physically resisting, turned, and began spitting numerous times in Officer Ninnis's face.  (HT, 41).  Officer Ninnis yelled for help, and Officer Kienert responded.  (HT, 41, 45).

Officer Kienert observed that petitioner was resisting Officer Ninnis and spitting in Ninnis's face.  (HT, 77).  When Kienert was close enough, he put his hands in front of Ninnis's face in an attempt to block petitioner's spit.  (HT, 78).  Officer Kienert was able to grab hold of petitioner and turn petitioner so that he faced into his cell.  Petitioner continued to struggle and resisted efforts to return him to his cell.  (HT, 78).  Petitioner was able to get his hands on the handcuff key from Officer Kienert's belt.  (HT, 78).  Petitioner wedged himself in the cell's door opening.  Officer Kienert attempted to force his way between petitioner and the door frame, but became pinned in that position.  Kienert saw petitioner look down at his arm, then move his head and mouth into a position to deliver a bite.  Officer Kienert testified

-4-

that petitioner "grabbed onto [his] arm, and [petitioner] just started gnawing and pulling and there was nothing [Kienert] could do." (HT, 79). Officer Kienert testified that petitioner gnawed on his arm for what "[f]elt like a really long time." (HT, 79).

Officer Mitchell was the third officer to arrive on the scene. When he arrived, Officers Ninnis and Kienert were trying to push petitioner into his cell and petitioner was vigorously resisting. (HT, 60-62). Mitchell found no room to grab onto petitioner's upper body, so he went after petitioner's legs. Petitioner continued to resist and Officer Mitchell received blows to his head from petitioner's legs. Officer Mitchell attempted to get petitioner off balance. He grabbed petitioner's legs and lifted. During this movement, Mitchell's arms moved up petitioner's body, and as petitioner struggled, the belly chains tore open wounds on Officer Mitchell's forearms. (HT, 63, 69). Petitioner continued to resist and kick, but the officers were able to get petitioner into his cell and onto his bed. Petitioner kicked Officer Mitchell and tried to bite Mitchell "several times." (HT, 63-64, 74). Mitchell eventually secured a "spit mask" over petitioner's face. (HT, 65). Mitchell then noticed the blood from his arm wounds. (HT, 65, 67). He further observed that petitioner had sustained a cut on his forehead during the struggle. (HT, 65, 72). Sometime during the altercation Officer Mitchell sustained a head wound and injured his lower back. (HT, 63).

After officers had managed to move petitioner to his bed in a face down position, Captain Place observed that Officer Ninnis had spit running down his face. The Captain ordered Ninnis to leave the area. Ninnis handed over the lead strap to another officer, left the cell, and sought immediate medical attention. (HT, 47). Guards were able to retrieve Officer Kienert's handcuff key from petitioner's hand. (HT, 81). Officer Kienert reported that petitioner had bitten him. When he pulled up his sleeve he discovered an open two-sided wound that was already swelling and turning black and blue. (HT, 81).

Petitioner's bite left a substantial scar on Officer Kienert's right arm.  (HT, 80).  It was a serious health concern that petitioner may have purposely spread his hepatitis C to Officers Ninnis, Kienert, and Mitchell.  (HT, 48, 81).  All three officers received preliminary medical treatment at the Brooks Center, and immediately thereafter to Marquette General Hospital.  (HT, 48, 51, 67).  The officers required regular blood tests for hepatitis for a full year, and were required to take additional precautions against the possibility of spreading the virus to members of their families.  (HT, 75, 82-83).  Judge Collins bound petitioner over for trial on all charges.  (HT, 58-59, 74, 86-89).

        2.    <u>Circuit Court</u>

On June 1, 2001, petitioner was arraigned in Marquette County Circuit Court.  Each of the counts of assault with intent to do great bodily harm less than murder was a felony carrying a maximum sentence of ten years.  The information had been supplemented with the prosecution's notice of its intent to proceed against petitioner as a habitual offender.  (Arraignment Transcript (AT) 3, docket # 22).  Thus, petitioner was faced potential life imprisonment if he was convicted on any one of the three felony charges.  See MICH. COMP. LAWS § 769.12(1)(a).  Attorney Fulsher advised the court that petitioner wished to stand mute all charges.  Judge Thomas L. Solka entered a plea of not guilty on plaintiff's behalf.  (AT, 6).  Petitioner was remanded to the custody of the Michigan Department of Corrections.

On July 31, 2001, Judge Solka conducted a hearing on defense counsel's pretrial motions for a change of venue, to quash petitioner's bindover for trial, for appointment of an expert, and to have petitioner appear for his trial in civilian clothes.  The court denied petitioner's motion for a change of venue.  (docket # 23 at 20).  It granted the unopposed motion to have petitioner appear for trial in civilian

clothes.  (*Id.* at 20-21).  The court granted the motion with regard to an expert and authorized funds.  (*Id.* at 31).  The court denied petitioner's motion to quash his bindover for trial.  (*Id.* at 41-46).

On November 15, 2001, the defense filed a notice of claim of insanity defense.  On November 25, 2001, Judge Solka entered his Order for Evaluation Relative to Criminal Responsibility.  (11/25/01 Order, found in Michigan Court of Appeals Record, docket # 31).  The court postponed the jury trial that had been scheduled for December 18, 2001.  (Marquette County Circuit Court record, docket # 19).  On February 2, 2002, licenced psychologist and consulting forensic examiner Thomas G. Brewer, Ph. D., completed his report which concluded with the following paragraph:

> In summary, it is the examiner's opinion that Mr. Ruiz was not mentally retarded, nor mentally ill as defined by statute at the time of the alleged incident.  Therefore, it is the examiner's opinion that the defendant does not meet the statutory requirements for a legal insanity defense.

(2/25/02 Report, found in Michigan Court of Appeals Record, docket # 31).  Following a conference with the attorneys on March 12, 2002, the court scheduled petitioner for a three-day jury trial beginning on August 14, 2002.  (Marquette County Circuit Court record, docket # 19).

On March 15, 2002, petitioner filed an "Interlocutory Claim of Appeal in Propria Persona" in the Michigan Court of Appeals.  (3/15/02 Interlocutory Claim of Appeal, found in Michigan Court of Appeals Record, docket # 31).  Petitioner requested leave to appeal the following:

(1)     his May 14, 2001 bindover for trial;

(2)     the orders denying the motions to quash the information and for a change of venue;

(3)     all orders granting requests by the prosecution;

(4)     the prosecution's November 14, 2001 witness list;

(5)     the November 26, 2001 order regarding blood testing; and

(6)      the May 22, 2001 supplemental information charging petitioner as a habitual offender.

Petitioner also argued that Attorney Fulsher had been ineffective for not filing a 180-day motion to dismiss

the case or a motion regarding a purported violation of a 60-day rule regarding submission of a forensic

evaluation report.  (*Id.*).  On March 21, 2002, the Michigan Court of Appeals advised petitioner that his

submission was defective, and that petitioner had twenty-one days within which to cure the specified

defects.  (3/21/02 Court of Appeals Letter, found in docket # 31).  Petitioner's response was an April 17,

2002, *pro se* application for leave to appeal to the Michigan Court of Appeals raising the following issues:

- Was the prosecutor mandated to show defendant was lawfully incarcerated at the preliminary examination?

- Was the magistrate mandated to ensure the people show every element of the principle charge and enforce the Legislature's mandate of lawfulness of confinement as an element of assault on a prison employee?

- Did the prosecutor have authority to charge defendant as a habitual offender where the elements of lawful imprisonment and intent were not proven to bind defendant over for trial?

- Did the prosecution and the court make a good faith effort to bring charges within the 180-day time limit?

- Did the court ensure that the forensic center submit the evaluation findings within the 60 day time limit from the September 6, 2000 court order?

- Was the preliminary examination held within the 14 day limit after the forensic report was faxed to the court on April 16, 2001?

- Should the motion to quash and or change of venue be granted?

(4/17/02 Application for Leave to Appeal at 2-3, Statement of Questions Involved, found in Michigan

Court of Appeals Record, docket # 31).  Petitioner wrote, "Defendant must take this late interlocutory

appeal because appointed counsel refused to take the necessary appeal procedures in defendant's defense

after requesting that he (Theodore F. Fulsher) proceed with an interlocutory appeal following the circuit

court's denial of both the motion to quash and change of venue." (*Id.* at vii).   Among other things, petitioner asked the Michigan Court of Appeals to dismiss Attorney Fulsher from the case.   On May 3, 2002, the Michigan Court of Appeals dismissed the appeal because petitioner had not acted in a timely manner to cure the defects in his application.   (5/3/02 Order, docket # 31).

On April 22, 2002, Attorney Fulsher filed a motion to withdraw as petitioner's counsel. On May 13, 2002, Judge Solka conducted a hearing on Fulsher's motion to withdraw.   (Motion to Withdraw Hearing Transcript (MW), docket # 25).   Petitioner denied that he was attempting to forestall or delay his trial.  (MW, 3).   Petitioner argued that there were "some issues that were not addressed by Mr. Fulsher from the preliminary exam" and the circuit court decisions on the bindover and change of venue motions that Attorney Fulsher refused to raise in an interlocutory appeal.  (MW, 3).   Petitioner stated that he was seeking an "independent counsel examination and a *Walker*[1] hearing in this matter . . . ."  (MW, 4).   Petitioner reported that he had unsuccessfully pursued the interlocutory appeal on his own.  (MW, 3). He acknowledged that the Michigan Court of Appeals had already dismissed his interlocutory appeal, but he blamed the dismissal on the purported removal of "some documents' by "prison staff."  (MW, 3). Attorney Fulsher told the court that he first discovered petitioner's desire for an interlocutory appeal when petitioner sent him copies of what petitioner had already filed in the Michigan Court of Appeals.  (MW, 6).   Fulsher stated that, in any event, there was no reason for an interlocutory appeal.   The issues had already been raised and preserved for appellate review.  (MW, 6).

Petitioner stated that he had filed a grievance against Attorney Fulsher and that the Michigan Attorney Grievance Commission had decided to take no action on petitioner's grievance.  (MW,

---

[1] A *Walker* hearing is an evidentiary hearing on the admissibility of inculpatory statements by a defendant. *See People v. Walker*, 132 N.W.2d 87 (Mich. 1965).

5).  Petitioner's grievance complained that when Attorney Fulsher visited him in prison, Fulsher had asked

petitioner to sign a release of his medical and psychiatric records to allow pursuit of the insanity defense.

Petitioner was reluctant to sign the release.   Attorney Fulsher advised petitioner that if he failed to

cooperate in the evaluation, petitioner might not be permitted to present an insanity defense at trial as

provided by Michigan statute.  Petitioner stated that he felt like counsel was coercing him into signing the

release.  (MW, 8).  Fulsher noted that the forensic center had performed an evaluation.  He had advised

petitioner that he was entitled to have an independent examiner appointed.   Petitioner expressed an

unfounded concern that Fulsher would only select an examiner provided by the prosecuting attorney.

(MW, 7).  There was no basis for a *Walker* hearing because no inculpatory statements had been obtained

from petitioner.  (MW, 8).

The prosecutor expressed concern that granting Attorney Fulsher's motion to withdraw

would delay petitioner's trial.  The prosecutor stated, "My concern, though, is that I'm not sure replacing

counsel is going to solve that problem.  I don't know that this necessarily is attached to Mr. Fulsher as the

problem.  So I don't know whether getting rid of him is going to solve anything." (MW, 9).  The court

echoed this concern.  (MW, 12-13).  It found that the issues petitioner had raised regarding the adequacy

of Attorney Fulsher's representation were "insubstantial":

> [T]he likelihood of the Court of Appeals granting an interlocutory appeal on this
> Court's decision not to quash the bindover is relatively slim, Mr. Ruiz, if there is any
> chance at all.
>
> It is very rare, if any [occasion], that the Court of Appeals would even grant leave
> to hear that on an interlocutory basis.  Now you do not have under the rules a right to
> interlocutory appeal.  You can certainly apply for appeal on those issues, but leave is very
> rarely, if ever, granted.
>
> As I review the history of this file, in terms of your right to have counsel represent
> you by -- or your right to have counsel of ordinary skill and training in criminal law to

-10-

represent you, from everything that I've seen in this file Mr. Fulsher has met and exceeded that standard of care in representing you.

(MW, 11-12).  The court found that petitioner was responsible for the breakdown in the attorney-client relationship with Attorney Fulsher, and that petitioner was responsible for the probable delay his trial date:

> I am not finding that breakdown to be the result of any acts or the failure to act by Mr. Fulsher.  I find that he has represented Mr. Ruiz with due diligence.  I am finding further that any delays attributable to the trial date of August 14 by this replacement of counsel are attributable to the defendant Mr. Ruiz and the request that a number of interlocutory appeals be taken and that defense counsel file other motions and that has led to a breakdown of this relationship and the need for replacement counsel.
>
> I am going to appoint the next available attorney on the court appointed counsel list . . . .  At this time, I am going to maintain the August 14 trial date.  However, in the event that [new counsel] reasonably needs an extension of time based on his late appointment, I'll consider that.  And again, Mr. Ruiz, I am finding that any delay in the trial date is attributable to the defendant in this case and not to the prosecution or the Court docket.

(MW, 14-15).  On May 23, 2002, the court entered its order allowing Mr. Fulsher to withdraw.

On May 24, 2002, the court appointed Attorney James Jessup.  (Marquette County Circuit Court record, docket # 19).  On June 12, 2002, the court conducted a scheduling conference.  The parties advised the court that plea negotiations had resulted in a new offer from the prosecutor's office, and that Attorney Jessup had an appointment scheduled to meet with petitioner and review the prosecution's offer.  (*Id.*).  On August 7, 2002, the court learned that petitioner intended to plead guilty to a reduced charge pursuant to a plea agreement.  (*Id.*).

On August 9, 2002, petitioner entered his guilty plea.  (Plea Transcript (PT), docket # 26).  The court placed petitioner under oath and petitioner testified that he had completed his GED and obtained a college diploma.  Judge Solka advised petitioner that if he pleaded guilty to the charge of assault of a prison employee he faced a consecutive sentence with a maximum of up to four years imprisonment and a fine.  (PT, 4).  Judge Solka advised petitioner that if he pleaded guilty he would not have a trial of any

-11-

kind, and that he would be giving up his trial rights, which the court went on to describe in detail.

Petitioner testified that he understood his rights and knew that by pleading guilty he would be waiving

these rights.  (PT, 4-6).  Petitioner testified that he understood that by pleading guilty he would be giving

up his right to any claim that his plea had been the result of promises made or threats against him that had

not been disclosed to the court.  Petitioner understood that he was waiving any claim that it was not his

choice to enter the guilty plea.  (PT, 6).  Petitioner then pleaded guilty to the charge of assault on a prison

employee:

> THE COURT: All right.  So what is your plea to the charge of assault on a prison employee?

> THE DEFENDANT: I plead guilty to assault on a prison employee.

(PT, 7).

Judge Solka then requested that the prosecutor state the terms of the plea agreement on the

record:

> MR. WALKER:      Yes, Your Honor.  In exchange for the plea of guilty of the charge of assault of a prison employee, the prosecution will seek to dismiss the other charges pending, we will bring no other charges arising from this incident, nor will we proceed against the defendant as a habitual offender.
>
> Further, Your Honor, as the Court has already indicated, the agreement contemplates the defendant completing interlocutory appeals which are currently pending.  But any appeal of this conviction would follow the normal process under People versus Rodriguez.
>
> Further, your honor, the prosecution would recommend that the Court order psychiatric treatment as part of the sentence.

(PT, 8).  Petitioner and Attorney Jessup agreed with the prosecutor's summary of the plea agreement.  (PT,

8).  Petitioner testified that his guilty plea was not the result of any threats or coercion.  (PT, 8).  It was his

decision and choice to enter the guilty plea.  (PT, 9).  Petitioner testified that during his July 12, 2000

altercation with guards at the Marquette Branch Prison, he bit Corrections Officer Kienert's arm.  (PT 9-

10).  Petitioner also stated that while he was resisting Kienert's effort to use a choke hold to get petitioner

back inside his cell, Kienert's arm came around petitioner's face and onto his mouth.  Petitioner described

his biting of Kienert's arm as a "deterrent" and something done in "self-defense under duress."  (PT,  9-

10).  Judge Solka then had petitioner relate the facts that established that he was guilty of the offense of

assault on a corrections officer in violation of Mich. Comp Laws § 750.197c:

> THE COURT:          What did you do?
>
> THE DEFENDANT: I bit down on the officer's arm.
>
> THE COURT:          So you bit the officer's arm?
>
> THE DEFENDANT:  Yes, Your Honor.

(PT, 10).  Judge Solka found that petitioner's plea was "understanding and voluntary," and he therefore

accepted petitioner's guilty plea.  (PT, 10).

On September 6, 2002, petitioner appeared before Judge Solka for sentencing.  (Sentencing

Transcript, 15, docket # 27).  As petitioner had requested, Attorney Jessup asked the court remove two

misdemeanor convictions from the presentence report (ST 5-6), although this did not make any difference

in the scoring of petitioner's sentence under Michigan's sentencing guidelines.  The summary page of the

presentence report "list[ed] eight felonies and two prior misdemeanors."  Judge Solka rejected the

argument that petitioner's misdemeanor convictions of aggravated assault in Ingham County and larceny

in Florida had been uncounseled.  Judge Solka declined to remove the misdemeanor convictions from the

presentence report.  (ST, 5-7).  Attorney Jessup raised two additional sentencing issues on petitioner's

behalf.  (ST, 3-5, 7-8).  Petitioner stated that there was nothing further in the presentence report that he

wished to have brought to the court's attention.  (ST, 9).  The court inquired whether there was anything further Attorney Jessup wished to state on his client's behalf before the court imposed its sentence. Attorney Jessup's response emphasized petitioner's efforts at self-improvement through various prison programs:

> So he has continued to try to better himself within the system and wishes to do so. As we discussed in the plea portion of this proceeding, Mr. Ruiz in desirous that the Court recommend to the Department of Corrections that he be afforded mental health treatment. He has indicated to me that he wishes to be placed at the Riverside Correctional Facility, which has a mental health component to it, which is also closer to his family so that he could have more contact with them.
>
> To the extent that the Court can make a recommendation to the Michigan Department of Corrections relative to mental health treatment, he desired that that be done.

(ST, 10).  During his opportunity for allocution (ST, 10-11) petitioner expressed a desire that the video recording of the July 12, 2000 incident be preserved for appellate review[2] and stated that he "intend[ed] to do better" and try to finish his term of imprisonment.  (*Id.*).  Judge Solka sentenced petitioner to 2-to-4 years' imprisonment, to be served consecutively to petitioner's other sentences, as required by Michigan law.  (ST, 15).  Judge Solka recommended that petitioner receive mental health counseling.  (9/6/02 Judgment of Sentence Commitment to Corrections Department, located in Michigan Court of Appeals record, docket # 32).

---

[2]On November 6, 2000, petitioner had filed a civil lawsuit in this court alleging that Officers Kienert, Ninnis, and Mitchell had used excessive force during the July 12, 2000 altercation, and that six other defendants had been deliberately indifferent to his serious medical needs.  *See Ruiz v. Martin*, et al., 2:00-cv-209 (W.D. Mich.).  On March 7, 2002, Judge Richard Alan Enslen granted the defendants' motion for summary judgment and entered judgment in favor of the defendants on all claims.  (3/7/02 Judgment).  On March 20, 2002, petitioner filed his notice of appeal.  This civil appeal was pending on September 6, 2002 when petitioner was sentenced.  On July 17, 2003, the United States Court of Appeals for the Sixth Circuit affirmed entry of judgment in favor of the defendants.  *See Ruiz v. Martin*, 72 F. App'x 271 (6th Cir. 2003).

-14-

Petitioner waited until October 14, 2002, to file his *pro se* motion to withdraw his guilty plea. On December 5, 2002, Judge Solka entered an order denying petitioner's motion. The court found no error. Petitioner's guilty plea had been entered in compliance with Michigan's court rules, which required that the court find that a guilty plea understanding and voluntary before accepting it. (12/5/01 Order on Motion to Withdraw Guilty Plea at 2-3, found in Michigan Court of Appeals Record, docket # 32). Judge Solka flatly rejected petitioner's contention that petitioner had been "sentenced to a term of indefinite commitment to a psychiatric institution following his 2 to 4 year sentence on this offense." (*Id.* at 2). Petitioner's counsel had merely stated that petitioner was "desirous" that the court recommend that the MDOC provide petitioner with mental health treatment, petitioner had said nothing contrary to his counsel's request at sentencing, and the court's sentence only recommended that the MDOC provide petitioner with counseling. "There is nothing in the record indicating that Defendant is to be committed to a mental health treatment facility at any time following the completion of his sentence." (*Id.* at 3).

On December 11, 2002, petitioner filed a delayed application for leave to appeal, motion for immediate consideration, and motion for resentencing in the Michigan Court of Appeals. On January 22, 2003, the court of appeals dismissed petitioner's motions without prejudice for failure to pursue the case in conformity with court rules. (1/22/03 Order, docket # 32). Petitioner did not seek review by the State's supreme court. (docket # 33).

On January 23, 2003, petitioner, through Attorney James B. Mitchell, Jr., filed another motion to withdraw his guilty plea. (Motion to Withdraw Guilty Plea, docket # 28). Attorney Mitchell argued (1) that there was not an adequate factual basis for the guilty plea; (2) that the plea agreement was "illusory" because (a) there was no "conditional" aspect because the Michigan Court of Appeals had already dismissed petitioner's interlocutory appeal, and (b) petitioner did not receive the benefit of his plea

-15-

bargain when the court failed to order mental health treatment by the Michigan Department of Corrections; and (3) petitioner's counsel had been ineffective in the following: (a) failure to engage an expert witness regarding the transmission of hepatitis; (b) failure to seek an independent psychiatric examination; (c) failure to view a videotape of petitioner's confrontation with prison guards; (d) failure to interview witnesses; (e) failure to investigate possible racial bias of the guards; (f) and purportedly inaccurate oral advice to petitioner that his sentence would include a minimum of 1 year of incarceration to be served concurrently to prior sentence; (g) failure to move for suppression of petitioner's statements.  Petitioner argued that Attorney Jessup's failure to prepare for trial had deprived petitioner of an opportunity to defend himself,  and therefore, petitioner's plea had  been involuntary and coerced.

On April 3, 2003, Judge Solka conducted a lengthy hearing on petitioner's motion to withdraw his guilty plea.  (Hearing Transcript, (HT), docket # 29).  Attorney Mitchell called Attorney James Jessup as a witness.  (HT, 6).  Jessup testified that he had been admitted to the State Bar of Michigan in 1980, was a member in good standing, and that he had extensive experience acting as defense counsel in criminal cases.  (HT, 8).  Attorney Jessup had experience in defending state prisoners charged with committing additional crimes during their incarceration.  (HT, 74-75).  Jessup was the third attorney appointed to represent petitioner on the criminal charges stemming from his July 12, 2000 confrontation with prison guards.  Jessup's predecessors, Attorneys Andriacchi and Fulsher had already developed a fairly extensive file.  Among other things, Jessup recalled that the file contained Fulsher's notes from meeting with witnesses (HT, 61), the police report regarding the July 12, 2000 incident (HT, 61), the notice of insanity defense (HT, 34), and a box of medical records from the Michigan Department of Corrections regarding petitioner's medical treatment.  (HT, 34).  Attorney Jessup was also aware of the possibility that there might be videotape evidence of the incident recorded by prison security cameras.  (HT, 34).  Jessup

-16-

was aware that petitioner had filed an interlocutory appeal.  (HT, 35).  After reviewing the file and the "fairly thick" packet of letters from petitioner that accompanied it, Jessup met with Attorney Fulsher and they discussed the status of petitioner's case.  (HT, 27, 32).  Among other things, Attorneys Jessup and Fulsher had discussed the potential need for exert testimony regarding hepatitis, the types of hepatitis petitioner has, and whether they were transmittable through saliva and through other means.  Fulsher had obtained the court order authorizing the hiring of an expert, but had been unable to find an expert willing to testify based at the funding level the court had authorized.  (HT, 28, 31-32).  Attorney Jessup had interviewed petitioner, but had not yet interviewed any other prisoners regarding the incident.  (HT, 41). Discussions with Attorney Fulsher and review of the file which included the preliminary examination transcripts,  police reports, and records of  prison disciplinary proceedings against petitioner, provided petitioner's attorney with a fairly good idea what witness testimony was likely to be elicited at trial.  (HT, 41-42).  Jessup testified that he believed he had sufficient information to enter into plea negotiations with the prosecution.  (HT, 62).  Attorney Jessup testified that if the plea negotiations had been unsuccessful, he would have requested the adjournment of the scheduled trial date.  The prosecutor had no objection to adjourning the trial date.  Jessup testified that in Marquette County Circuit Court that it was "routine procedure" to grant a newly appointed attorney at least one adjournment (HT, 63), and Judge Solka had stated during the hearing on Fulsher's motion to withdraw that he would grant newly-appointed counsel additional time to prepare for trial if requested.

Even without a habitual offender enhancement, petitioner faced maximum sentences of ten years on each of the charges of assault with intent to do great bodily harm less than murder.  The plea agreement was concisely summarized as follows:

Q       [I]n essence, the plea agreement was that the foremost, the largest felonies, the ten-
year felonies, went away; the habitual went away and Mr. Ruiz only ended up
pleading to the four-year felony?

A       Correct.

(HT, 58). Attorney Jessup testified that he was confident that as a result of his guilty plea, petitioner faced

"considerably less time in prison than he would have under the original charge." (HT, 12). "[T]he ultimate

result and reason for the plea was to reduce [petitioner's] time in prison." (HT, 12-13).  Attorney Jessup

discussed with petitioner his risks of going to trial and possibly being found guilty on all counts versus a

plea to a four-year felony.  (HT, 60).  Petitioner was already serving a lengthy prison sentence for felony

of assault with intent to do great bodily harm less than murder, enhanced as a habitual offender, fourth

felony offense.  Petitioner's misconduct while in prison had resulted in his placement in the maximum

security area of the prison where the July 12, 2000 incident had occurred.  (HT, 75-76).  Attorney Jessup

thought that the plea agreement was reasonable, and he recommended that petitioner accept it.  (HT, 59,

71). Petitioner signed the plea agreement on August 7, 2002.  (HT, 22, 76).

Immediately before entering his guilty plea on August 9, 2002 petitioner expressed his

desire to have two additions made to the plea agreement.  He wanted a provision added regarding his *pro

se* interlocutory appeal and a second provision regarding his desire to receive mental health treatment while

incarcerated.  (HT, 17, 65-66).  Petitioner, with knowledge that the Michigan Court of Appeals had

dismissed his interlocutory appeal months earlier, nonetheless expressed a desire not to waive the issues

he had asked the appellate court to review on an interlocutory basis.  (HT, 12, 14-15).  Under the plea

agreement petitioner did not waive the issues raised in his interlocutory appeal and the prosecution would

request that the court recommend that the MDOC provide petitioner with mental health counseling.  (HT,

29).  The  plea agreement was filed in Marquette County Circuit Court on August 9, 2002. (HT, 23).

-18-

Attorney Jessup testified that at the time of the plea, Judge Solka had advised petitioner the MDOC would make the determination whether petitioner received mental health counseling. Judge Solka could only recommend it, but could not order the MDOC to provide it. (HT, 17-18). Attorney Jessup was aware that petitioner's statements to the effect that he was acting in self-defense made for a relatively weak factual basis for the plea, but Jessup did not object to the plea on that basis because petitioner had clearly expressed his desire to plead guilty. Petitioner admitted that on July 12, 2000 he bit a corrections officer on the arm. (HT, 66). Petitioner had not indicated that he did not wish to go forward with his guilty plea. (HT, 48). Petitioner did not state at any time subsequent to the entry of his plea and before sentencing that he desired to withdraw his guilty plea. (HT, 66). Petitioner never expressed a desire to withdraw his guilty plea on the date he was sentenced. (HT, 66).

Petitioner testified that he understood that if he entered a plea of guilty to the lesser charge of assault on a prison employee, the three ten-year felonies and the habitual offender charge would "go away." (HT, 103). Petitioner testified that he had opportunities to meet all three of the attorneys who had been appointed to defend him against the criminal charges. (HT, 87). Petitioner understood that he had been charged with three counts of assault with intent to do great bodily harm less than murder, each a ten-year felony offense. Petitioner further understood that he had been charged as a habitual offender. (HT, 100). Petitioner claimed that Attorney Jessup had advised him that under the plea agreement that he would be sentenced to "one to four [years] with [credit for] time served." (HT, 90). Petitioner testified that "1 to 4 with time served" meant that he "would do the time from the date of the alleged incident up until four years within the sentence that [he] was already doing, which would mean that it would run concurrent[ly] from the year 2000 up until 2004." (HT, 90). Petitioner claimed that he was "confused and perplexed"

-19-

when Judge Solka sentenced him to a consecutive term of two-to-four years.  (HT, 91).  Petitioner testified

that his memory of what he said when he entered his plea was as follows:

> I remember saying that because I was being escorted from the shower pit to my cell on
> base, an altercation ensued where ultimately I was assaulted by the staff.  As the officers
> [sic] tried to choke me, he came up with his arm over my mouth and applied pressure,
> opening my mouth, and I bit down on his arm because the officers that were behind me
> were hitting in my ribs and stomach. That was inside the vestibule area.  That's all I recall.

(HT, 95).

On August 5, 2003, the court entered an opinion and order denying petitioner's motion to

withdraw his guilty plea.  The court rejected petitioner's argument that the factual basis for his guilty plea

had been inadequate.  The court found that petitioner's admission that he bit Correction's Officer Kienert's

arm was a sufficient factual basis to support petitioner's guilty plea.[3]  Judge Solka found that petitioner's

admission that he "engaged in a scuffle" with prison guards and that petitioner bit a corrections officer's

arm established the factual basis for petitioner's plea.   (Opinion & Order at 4, found in Michigan Court

of Appeals record, docket # 34).   Petitioner "did not have a right to use force and biting to resist and

obstruct corrections officers."  (*Id.*).  Judge Solka rejected petitioner's claim that the plea agreement had

been illusory.  (*Id.* at 5-9).  The  plea could not have been illusory because petitioner obviously was aware

of the status of his interlocutory appeal.  (*Id.* at 7).  Judge Solka rejected  petitioner's claim that he  was

entitled to withdraw his guilty plea on the basis of six alleged instances of ineffective assistance of counsel.

Judge Solka began his analysis with the Sixth Amendment standard established by the Supreme Court in

---

[3] The adequacy of the factual basis for petitioner's guilty plea was not raised in his petition,
nor could it be.  The requirement of a factual basis for a plea is a creature of rule, not the federal
Constitution.  The state courts are not constitutionally required to establish a factual basis for an
otherwise voluntary and intelligent plea. *See North Carolina v. Alford*, 400 U.S. 25, 37-38 (1970);
*Roddy v. Black*, 516 F.2d 1380, 1385 (6th Cir. 1975).

*Strickland v. Washington*, 466 U.S. 668, 687-94 (1984).[4]  Petitioner was required to show that counsel's conduct fell below an objective standard of reasonableness under prevailing professional norms and overcome the presumption that the challenged action might be considered sound trial strategy.  He was also required to show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  The court rejected petitioner's claim based on counsel's failure to obtain an expert regarding the transmission of hepatitis through saliva.  Petitioner had provided no evidence that an expert would have assisted him in obtaining a different result.  "Furthermore, such a witness would not have been very useful because the elevated assault charge would have been based on the defendant's *belief* on whether hepatitis could be transmitted through saliva."  (Op., 10).  Petitioner presented no evidence that an independent psychiatric evaluation would have assisted petitioner in obtaining a different result.  "Furthermore, the insanity defense is a notoriously hard defense to prove and Defendant has failed to prove that [the] decision not to proceed with such a defense was not sound trial strategy."  (*Id.*).  Judge Solka found that petitioner had presented no evidence that a different result would have been achieved if counsel had reviewed the prison security camera videotape.  (*Id.*).  Petitioner presented no evidence regarding how an investigation of possible racial bias of the guards would have helped petitioner obtain a different result.  Furthermore, the court had conducted a review of the files of the guards involved in this incident and found that there was "nothing in them that would likely lead to a different result."  (*Id.* at 11).  Judge Solka rejected petitioner's claim that Attorney Jessup had been constitutionally ineffective because he had not interviewed witnesses.  Jessup had reviewed the witness statements and other evidence in Attorney Fulsher's file.  There was no evidence that witness statements

---

[4]Judge Solka's opinion incorporated quotations from *People v. Johnson*, 545 N.W.2d 637, 639 (Mich. 1996)(quoting *Strickland*) and *People v. Eloby*, 547 N.W.2d 48, 50-51 (Mich. App. 1996)(quoting *People v.Effinger*, 536 N.W.2d 809, 811 (Mich. 1995) citing *Stickland*).

would have assisted petitioner in achieving a different result.  Petitioner was not stampeded into his guilty

plea because his attorney was not prepared for an August 2002 trial.  If plea negotiations had broken down,

Jessup could have easily requested a continuance.  (*Id.*).   Judge Solka found credible Attorney Jessup's

testimony that he accurately advised petitioner that on pleading guilty, petitioner faced a consecutive

sentence of up to four years.  He rejected petitioner's contrary testimony, among other things, noting that

petitioner had not requested to withdraw his plea on discovering that he faced a consecutive sentence of

up to four years.  (*Id.*).

> **B.      Appellate and Post-conviction Proceedings**
>
> > 1.      Applications for Leave to Appeal to Michigan's Appellate Courts

On August 20, 2003, Attorney Mitchell filed a delayed application for leave to appeal to

the Michigan Court of Appeals on petitioner's behalf.  The three issues raised were as follows:

> I.      WHETHER THE TRIAL COURT CLEARLY ABUSED ITS DISCRETION
> WHEN DENYING THE MOTION TO WITHDRAW A GUILTY PLEA
> BECAUSE THERE WAS NOT AN ADEQUATE FACTUAL BASIS FOR A
> GUILTY PLEA[.]
>
> II.      WHETHER THE TRIAL COURT ABUSED ITS DISCRETION WHEN
> DENYING THE MOTION TO WITHDRAW THE GUILTY PLEA BECAUSE
> THE PLEA AGREEMENT WAS ILLUSORY AND MR. RUIZ DID NOT
> RECEIVE THE NEGOTIATED BENEFITS[.]
>
> III.      WHETHER THE TRIAL COURT ABUSED ITS DISCRETION WHEN
> DENYING THE MOTION TO WITHDRAW A GUILTY PLEA BECAUSE
> DEFENDANT'S TRIAL COUNSEL WAS INEFFECTIVE[.]

(Defendant-Appellant's Application for Leave to Appeal at 2, Statement of Questions Involved, found in

the Michigan Court of Appeals record, docket # 34).  On November 24, 2003, the Michigan Court of

Appeals denied petitioner's application for leave to appeal "for lack of merit in the grounds presented."

(11/24/03 Order, docket # 34).  Petitioner attempted to raise the same issues in his *pro se* application for leave to appeal to the Michigan Supreme Court.  On May 28, 2004, the Michigan Supreme Court entered its order denying petitioner's application for leave to appeal.  (5/28/04 Order, docket # 35).

          2.     <u>Federal Habeas Corpus Petitions</u>

          (a)     *Ruiz v. Smith*, 5:04-cv-93 (W.D. Mich.)

On June 30, 2004, petitioner filed the first of his three petitions for federal habeas corpus relief.  *Ruiz v. Smith*, 5:04-cv-93 (W.D. Mich.).  The grounds petitioner raised in this petition were: (1) that petitioner's conviction had been obtained by the unconstitutional failure of the prosecution to disclose evidence favorable to the petitioner; (2) that petitioner's guilty plea had been made without knowledge of the consequences and had been coerced; and (3) ineffective assistance of counsel in Attorney Jessup's (a) failure to engage an expert witness regarding the transmission of hepatitis through saliva; (b) failure to seek an independent psychiatric evaluation to support the presentation of an insanity defense; (c) failure to review the videotape of the July 12, 2000 incident; (d) failure to interview witnesses; and (e) failure to retain the original plea agreement for 1-to-4, with credit for time served.  Chief Judge Robert Holmes Bell found that petitioner had not fairly presented his prosecutorial misconduct claim to the Michigan courts.  (8/10/04 Op. at 4).  Petitioner's new claims that his guilty plea had been coerced and unknowing had not been raised in the petitioner's applications for leave to appeal.  (*Id.*).  Chief Judge Bell wrote that it appeared that "only some" of petitioner's claims of ineffective counsel claims had been raised  On August 10, 2004, Chief Judge Bell entered a judgment dismissing the petition without prejudice pursuant to Rule 4 of the Rules Governing § 2254 cases.  (8/10/04 Judgment).  On September 29, 2004, petitioner filed a motion for relief from the court's judgment.  The court entered an order on October 13, 2004, denying

petitioner's motion.  A year later, on October 14, 2005, petitioner filed an untimely notice of appeal.  On

February 14, 2006, the United States Court of Appeals for the Sixth Circuit dismissed petitioner's appeal.

*See Ruiz v. Smith*, No. 05-2430 (6th Cir. Feb. 14, 2006).

(b)    <em>Ruiz v. Smith</em>, 1:04-cv-624 (W.D. Mich.)

On September 16, 2004, petitioner filed a second application for federal habeas corpus

relief.  The grounds raised were "identical" to those in his first petition.  *Ruiz v. Smith*, 1:04-cv-624 (W.D.

Mich.).  Judge David W. McKeague dismissed this petition without prejudice because petitioner had not

exhausted his available state-court remedies.  Petitioner had returned to the Marquette County Circuit

Court and filed a motion for relief from judgment under Rule 6.500 of the Michigan Court Rules.  On

September 8, 2004, the trial court denied a portion of the motion and ordered further briefing on another

part.  Petitioner filed his second habeas corpus petition without awaiting the trial court's ruling on the

remainder of his motion or seeking any type of appellate review.  Judge McKeague summarily dismissed

the petition on November 30, 2004.  (11/30/04 Judgment).

3.    <u>Motion for Relief Under Rule 6.500 of the Michigan Court Rules and<br>Applications for Appellate Review</u>

On September 29, 2004, petitioner filed a motion in the Marquette County Circuit Court

pursuant to Rule 6.500 of the Michigan Court Rules.  The three issues raised were: (1) whether petitioner's

conviction had been obtained by the unconstitutional failure of the prosecution to disclose exculpatory

evidence in the form of the prison security camera videotape; (2) whether petitioner's conviction had been

obtained through an unknowing or coerced guilty plea; and (3) whether petitioner had been denied he

effective assistance of counsel.  On September 8, 2004, Judge Solka held that petitioner's second and third

-24-

arguments were meritless.  He held that petitioner's guilty plea had not been coerced and that petitioner

had entered into his guilty plea with knowledge of the consequences.  (9/8/04 Op. at 3, docket # 30).

> Defendant was informed of the charges against him, on the record, and the possible
> consequences of a conviction or guilty plea to the charges (guilty plea transcript, pg. 4).
> Defendant verbally acknowledged his understanding of the charge and possible
> consequences.  After hearing the plea agreement on the record (guilty plea transcript pgs.
> 7-8), Defendant orally acknowledged on the record that the plea agreement constituted his
> understanding of the agreement and that no promises were made to him beyond the plea
> agreement stated on the record.

(*Id.* at 3-4).  Petitioner's guilty plea had been knowing and voluntary.  (*Id.*).

Judge Solka held that all six of petitioner's claims of ineffective assistance of counsel were

meritless.  Petitioner had claimed that counsel had been constitutionally ineffective in "failing to engage

an expert witness, failing to obtain an independent psychiatric evaluation as to an insanity defense, failing

to review the videotape of the incident [], failing to investigate the possible racial bias of the MDOC,

failure to interview witnesses, and failure to maintain the original condition of the plea agreement of a

recommendation for 1-4 year sentence with credit for time served and 'preservation' of an interlocutory

appeal."   (Op. at 4).  The only claim of ineffective assistance of counsel not previously addressed and

rejected by the court was that counsel failed to preserve a purported provision of the plea agreement for

recommendation for a 1-to-4 year sentence with credit for time served and for preservation of petitioner's

interlocutory appeal.  (*Id.* at 7).

Petitioner's claim that counsel had been ineffective for failure to preserve petitioner's

interlocutory appeal was patently meritless.  Judge Solka noted that under Rule 7.203(B), petitioner had

no right of interlocutory appeal on any pre-trial orders of the court because they had not been final orders.

When petitioner entered his guilty plea on August 9, 2002, the Michigan Court of Appeals had already

dismissed his *pro se* interlocutory appeal for failure to comply with the rules.  Petitioner and Judge Solka

were well aware that the appeal had been dismissed, because it had been addressed at the May 13, 2002

hearing on Attorney Fulsher's motion to withdraw.  (MW, 3).  The Michigan Court of Appeals had

dismissed the appeal *without prejudice*, and petitioner never reinstated his application for leave to appeal:

> Nothing in Defendant's guilty plea arraignment on August 9, 2002, or his subsequent
> sentencing on September 6, 2002, prejudiced Defendant's right to pursue issues that he had
> attempted to raise by interlocutory appeal.  Under this procedural history, the Court does
> not discern any ineffective assistance of counsel in negotiating a plea agreement that had
> an adverse effect on Defendant's attempt to assert certain issues on an interlocutory appeal
> that had already been dismissed by the Court of Appeals without prejudice for [sic]
> Defendant to further pursue those issues.

(Op. at 6).

Judge Solka found that petitioner's counsel could not have been constitutionally ineffective

for failure to failure to "maintain" a purported provision of the plea agreement for a recommendation of

one-to four years' imprisonment with credit for time served, because consecutive sentences were mandated

by statute:

> Under Michigan law, a person who is incarcerated in a penal institution in this state
> and who commits a crime during that incarceration is punishable by further imprisonment,
> is required to serve any sentence that is imposed consecutive to the sentence running at the
> time of [commission] of the crime.  "The term of imprisonment imposed for the crime shall
> begin to run at the expiration of the term or terms of imprisonment which the person is
> serving . . . [.]"  MCL 768.7A.  A Michigan trial court has no statutory authority to waive
> this consecutive sentencing requirement imposed by statute, *People v Chavies*, 234 Mich
> App 274 (1999), *People v Evans*, 173 Michigan Appeals 631 (1988).  With statutorily
> mandated consecutive sentencing, the Court would have no authority, under this case[law]
> and statute, to give Defendant credit for time served.  Further, at the time of his guilty plea
> arraignment, August 9, 2002, Defendant was informed on the record that he could be
> sentenced for up to four years in prison "and it would be a consecutive sentence."
>
> Because the court had no statutory authority to sentence Defendant with credit for
> time served, Defendant's counsel could not be ineffective for failing to preserve a plea
> agreement premised on a sentence that was statutorily impossible.

(Op. at 6).

The sole remaining issue was whether petitioner's constitutional rights had been violated by the prosecution's failure to disclose purported *Brady* material. Judge Solka directed the prosecutor file a response to the motion, and petitioner received an opportunity to view the videotape. Judge Solka reviewed the videotape *in camera*. The videotape was a Marquette Branch Prison security videotape dated July 12, 2000, running approximately eighteen minutes, from 3:46 p.m. to 4:04 p.m. On March 15, 2005, the court entered an order denying the remainder of petitioner's 6.500 motion. (3/15/05 Findings, Decision & Order on 6.500 Motion, docket # 6-2). The court found that the tape failed to reveal anything related to the criminal charges against petitioner and the offense of which he was convicted. Judge Solka described the videotape in these terms:

> It is a black and white tape, somewhat grainy and taken at a long distance - it is a wide angle view, showing a large area of multiple cells in this cell block. The specific and explicit details of what happened within the cell leading to the assault charge, as Defendant was being returned to his cell, is not visible on the videotape. The underlying allegations of the charge to which Defendant plead guilty is that as corrections officers were attempting to return Defendant to his cell, he bit one of the corrections officers, drawing blood, knowing that he was diagnosed as positive for Hepatitis C. The videotape is simply not close enough to provide any level of detail of this incident as Defendant was being returned to his cell.

The court found no evidence supporting petitioner's claim that the videotape had somehow been tampered with or altered. The tape was neither exculpatory or inculpatory. It was "simply inconclusive, without any detail supporting his guilt or innocence." The court held that no *Brady* violation had occurred and denied petitioner's Rule 6.500 motion. (*Id.* at 4-6).

On April 8, 2005, petitioner filed a delayed application for leave to appeal for leave to appeal to the Michigan Court of Appeals. The four issues listed in petitioner's statement of questions were as follows:

(1)　　The defendant seeks to withdraw his guilty plea.

    (2)      Was defense counsel James R. Jessup ineffective in advising defendant to plead guilty?

    (3)      Did the prosecution violate defendant's due process rights by withholding the videotape?

    (4)      Defendant requests that the Court of Appeals remand this case to the trial court.

(Statement of Questions, Delayed Application for Leave to Appeal, found in Michigan Court of Appeals record, docket # 36).  By order entered October 14, 2005, the Michigan Court of Appeals denied petitioner's application for leave to appeal for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D).  (10/14/2005 Order, docket # 36).

On October 27, 2005, petitioner filed an application for leave to appeal to the Michigan Supreme Court.  On December 27, 2005, the Michigan Supreme Court denied petitioner's application for leave to appeal because petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  (5/27/2005 Order, docket # 37).

On January 4, 2006, petitioner filed his third petition for federal habeas corpus relief.  On February 8, 2006, petitioner filed his amended petition (docket # 6, ¶ 14) raising the grounds listed at the beginning of this report and recommendation.

**Applicable Standards**

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001), *cert. denied sub nom.*, *Texas v. Penry*, 547 U.S. 1200 (2006); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir. 2008).  The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  AEDPA "dictates a highly deferential standard for evaluating state-

court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*,

543 U.S. 447, 455 (2005) (citations omitted); *see Wilkins v. Timmerman-Cooper*, 512 F.3d 768, 774 (6th

Cir. 2008). "AEDPA requires heightened respect for state court factual and legal determinations."

*Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential

AEDPA standards must be applied. 28 U.S.C. § 2254(d). *De novo* review is restricted to instances where

the state court did not address the merits of a claim. In that limited set of circumstances, "there are simply

no results, let alone reasoning, to which [the habeas] court can defer." *McKenzie v. Smith*, 326 F.3d 721,

727 (6th Cir. 2003); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Maples v. Stegall*, 427 F.3d

1020, 1025 (6th Cir. 2005).

The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are

given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). Section

2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated

pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the

merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law as determined by the Supreme Court of the

United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Section

2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal

habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from

the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme

Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted).

A federal court may grant relief under the "unreasonable application" clause if the state court correctly

identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

"It is important to note, however, that 'an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.'" *Harbison v. Bell*, 408 F.3d 823, 829 (6th Cir. 2005)(quoting *Williams*, 529 U.S. at 409). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *see Walls v. Kontech*, 490 F.3d 432, 436 (6th Cir. 2007); *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410; *see Bell v. Cone*, 535 U.S. at 694; *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006)("The proper inquiry under the 'unreasonable application' analysis is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect."), *cert. denied sub. nom. Keith v. Houck*, 127 S. Ct. 1881 (2007).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. at 412; *Ross v. Petro*, 515 F.3d 653, 660 (6th Cir. 2008). This court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked for

constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).

The AEDPA standard includes an important temporal limitation. "'[C]learly established Federal law as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003)(quoting *Williams*, 529 U.S. at 412); *see Fautenberry v. Mitchell*, 515 F.3d 614, 623 (6th Cir. 2008). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004)(describing the issue of whether the law was clearly established by Supreme Court precedent as a "threshold inquiry"). "'Federal Courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.'" *Payne v. Bell*, 418 F.3d 644, 656 (6th Cir. 2005) (quoting *Cone v. Bell*, 543 U.S. at 455). "The state court decision need not cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, 'so long as neither the reasoning nor the result of the state court decision contradicts them.'" *Dennis v. Mitchell*, 354 F.3d 511, 517-18 (6th Cir. 2003) (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires heightened respect for state factual findings. 28 U.S.C. § 2254(e)(1); *see Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence 28 U.S.C. § 2254(e)(1); *Ivory v. Jackson*, 509 F.3d 284, 291 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1897 (2008).

This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006).

### Discussion

### I.      Knowing and Voluntary Guilty Plea  (Ground I)

When a state defendant brings a federal habeas petition challenging the voluntariness of his plea, the state generally satisfies its burden of showing a voluntary and intelligent plea by producing a transcript of the state-court proceeding. *Garcia v. Johnson*, 991 F.2d 324, 326 (6th Cir. 1993).  Where the transcript is adequate to show that the plea was voluntary and intelligent, a presumption of correctness attaches to the state-court findings of fact and to the judgment itself. *Id.*  A satisfactory state-court transcript, containing findings after a proper plea colloquy, places upon petitioner a "heavy burden" to overturn the state findings.  *Id.* at 328; *see Parke v. Raley*, 506 U.S. 20, 29 (1992).  The constitutional validity of a plea of guilty entered in the state courts is to be judged under the due-process standard set forth by the United States Supreme Court in *Boykin v. Alabama*, 395 U.S. 238 (1969).  Under *Boykin*, a guilty plea must be knowing and voluntary in order to withstand scrutiny under the Due Process Clause. A criminal defendant enters a guilty plea knowingly when he understands the nature of the charge and the "direct consequences" of his plea.  *See Brady v. United States*, 397 U.S. 742, 748 (1970).  In general, a defendant is aware of the direct consequences of his plea if he is aware of the maximum and minimum (if any) sentence that may be imposed.  *See King v. Dutton*, 17 F.3d 153, 153-54 (6th Cir. 1994).

It is well settled that a guilty plea may be rendered involuntary it was induced by the ineffective assistance of counsel. *See  Hill v. Lockhart*, 474 U.S. 52, 56 (1985).  "The longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice

among the alternative courses of action open to a defendant." *Id.* at 56.  To prevail on a claim of ineffectiveness, a petitioner must allege facts showing both constitutionally ineffective performance and resulting prejudice. *Id.* at 58-59.  In the context of a guilty plea, the "prejudice" standard requires a petitioner to show a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Id.* at 59.  Absent a guilty plea, petitioner faced an almost certain conviction on all three felony charges, followed by the probable imposition of a life sentence as a habitual offender.  Petitioner has not presented evidence that but for counsel's alleged errors, he would have insisted on going forward with his trial and its attendant risk of life imprisonment.  He argues that counsel was ineffective for failure to advise him not to go forward with the plea based on a purported alteration of the plea agreement eliminating a provision for a sentence of "1 to 4 with credit for time served," and by allowing petitioner to enter his plea "without reviewing the videotape." (docket # 6, ¶ 14(a).  Petitioner has not presented the necessary clear and convincing evidence to overcome the state court's factual finding that there was no provision in the plea agreement for a sentence of 1-to-4 with credit for time served.  The prison security camera videotape did not show petitioner's confrontation with prison guards.  Counsel's failure to recommend that his client bypass an overwhelmingly beneficial plea agreement because he and his client had not yet reviewed such a videotape cannot, by any stretch of imagination, be deemed constitutionally ineffective assistance of counsel.

The state court determinations that petitioner's guilty plea was knowing and voluntarily easily pass habeas review under deferential AEDPA standards.  28 U.S.C. § 2254.  Petitioner's argument that the plea agreement was illusory is unworthy of a separate discussion.  This  plea agreement enabled petitioner to avoid a likely life sentence and petitioner only received a two-to-four year sentence for his assault on the officers.

-33-

## II.        Alleged *Brady* Violation (Ground II)

Petitioner argues that the prosecutor committed a *Brady* violation by withholding the prison security camera videotape.  The federal Constitution does not create a general right to discovery in state criminal cases.  *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).  In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that due process requires the prosecution to disclose evidence only when it is favorable to the accused, and where such evidence is material to guilt or punishment.[5]  373 U.S. at 87. For purposes of *Brady*, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defendant, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see Fautenberry v. Mitchell*, 515 F.3d 614, 629 (6th Cir. 2008).  The state court determined that the videotape was not favorable to petitioner, and petitioner has presented no evidence to the contrary.  Petitioner did not present evidence showing a reasonable probability that but for the non-disclosure of the videotape, he would have insisted on going to trial.  *Fautenberry*, 515 F.3d at 629.  The state court finding that no *Brady* violation occurred easily passes review under deferential AEDPA standards.

## III.        Ineffective Assistance of Counsel  (Ground III)

Petitioner argues that his third appointed attorney, James Jessup, was constitutionally ineffective because Jessup  (a) never filed a motion for production of the videotape; (b) failed to interview

---

[5]There is no clearly established Supreme Court precedent establishing that the prosecution must disclose material exculpatory evidence under *Brady* before a plea is entered. *See Orman v. Cain*, 228 F.3d 616, 620 (5th Cir. 2000); *accord United States v. Contreras*, 272 F. App'x 344, 345 (5th Cir. 2008)("A defendant entering a guilty plea cannot rely on *Brady* materials in seeking postconviction relief, because his right to a fair trial is not implicated.").  Relief is therefore unavailable on this ground under AEDPA in any event.

unspecified witnesses; (c) failed to "question the bias[ed] acts of guards; (d) failed to file a motion for an expert on the transmission of hepatitis C; and (e) "coerced petitioner to sign a conditional plea agreement that placed petitioner in a 'Hobson's choice' of signing the contemporaneous plea or face the charges originally filed."   (docket # 6, Ground III, ¶ 14(a)).  The state court rejected all petitioner's claims of ineffective assistance of counsel.

Although petitioner  faced a significant hurdle under the *Strickland* standard in state court on his claims of ineffective assistance of counsel, he now faces an even higher hurdle under AEDPA standards:

> To prove ineffective assistance of counsel, a petitioner must show deficient performance and resulting prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  *Strickland* requires that reviewing courts be highly deferential of counsel's performance.  *Id.* at 689, 104 S.Ct. 2052.  Counsel renders ineffective assistance when his performance "f[alls] below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. 2052, but there is a "strong presumption" that counsel's performance was professionally reasonable, *id.* at 689, 104 S.Ct. 2052.  Prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.  Although this is a high burden for a petitioner to satisfy, it is even higher for a petitioner proceeding under the AEDPA:
>
>> For [a petitioner] to succeed, ... he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly.  Rather, he must show that the [state] Court of Appeals applied Strickland to the facts of his case in an objectively unreasonable manner.

*Carter v. Mitchell*,  443 F.3d 517, 525 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 955 (2007) (quoting *Bell v. Cone*, 535 U.S. 685, 698-99 (2002)).  Attorney Jessup was adequately prepared to enter into plea negotiations with the prosecutor, and by any measure, Jessup achieved a plea agreement stunningly

favorable to petitioner.  Petitioner's contention that he was stampeded into pleading guilty because his attorney was not prepared to go forward with his trial is utterly refuted by the record.  Even before Attorney Jessup had been appointed, Judge Solka had stated on the record that he was favorably disposed to granting an adjournment if petitioner's appointed counsel needed it.  Again, the state court findings that there were no constitutional violations easily pass review under AEDPA standards.

### IV.  Failure to Bring Petitioner's Case to Trial Within 180 Days as required by Rule 6.004(D) of the Michigan Court Rules. (Ground IV)

Petitioner's argument that his rights were violated because he was not tried within 180 days as required by Rule 6.004(D) of the Michigan Court Rules is patently meritless.  "Federal habeas corpus relief does not lie for errors of state law."  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  In any event, there was no violation of the State's 180-day rule, because criminal offenses "committed by an inmate of a state correctional facility while incarcerated in the correctional facility" are expressly exempted from the 180-day rule.  *See* Mich. Ct. R. 6.004(D)(1) and MICH. COMP. LAWS § 780.131(2)(a).

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

Dated:  August 14, 2008                    /s/  Joseph G. Scoville
                                           United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *McClanahan*

*v. Commissioner*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).